Good morning, Your Honors. May it please the Court, my name is Amita Talak, Court-Appointed Counsel for Plaintiff Appellant Andre Craver. With the Court's permission, I'd like to reserve two minutes for rebuttal. We are here today because the Magistrate Judge improperly granted summary judgment. She weighed the evidence, made credibility determination, and drew inferences in favor of defendant. But at this stage, the Court's sole role is to determine, viewing the evidence in the light most favorable to the non-movement here, Mr. Craver, whether there is sufficient evidence in the record such that a reasonable jury could find for Mr. Craver. We urge this Court to conclude that there was and to reverse and remand for further proceedings. Now, deliberate indifference to serious medical needs claims ask two questions. The first is assessed from the objective perspective and asks whether there was a serious deprivation under the Eighth Amendment standards. This Court has held that the repeated deprivation of adequate nutrition is in itself a serious deprivation. And as such, in these claims, the question becomes whether the inmate was provided with inadequate nutrition. The second question—  Deliberately inadequate. —Yes, Your Honor. The second question is assessed from the subjective perspective and gets to the defendant's deliberate indifference towards the risk posed to the inmate's health. Craver presented sufficient evidence on both prongs here, and for that reason, summary judgment was inappropriately granted. So the first question here, the objective one, Craver presented evidence both of the direct caloric inadequacy of his diet, as well as indirect symptoms caused by the inadequate nutrition. Now, the magistrate judge contended that there was not enough evidence linking causationally the inadequate nutrition to these symptoms. But respectfully, there is evidence in the record suggesting that these symptoms could be tied to inadequate nutrition, or at least from which a reasonable jury could conclude so. I thought, Ms. Tellick, that he refused to drink a caloric drink because he didn't like it. Your Honor, there is a disputed issue of fact on that issue specifically. Floyd contends that it was because he did not like it, but there is evidence in the record that Craver could not stomach the Boost drink because of his chemotherapy. But there was no evidence of him vomiting other than his claim, correct? In Floyd's notes, Your Honor, he reported that he was vomiting to her as well as to his PCP. So there is some contemporaneous evidence in the record. And especially coupled, excuse me, with the fact that he was undergoing chemotherapy, we believe a reasonable jury could conclude that these were indeed true taste aversions because there was separate evidence of his chemotherapy and multiple myeloma. This was not just a regular inmate claiming that they had aversions, but rather it was somebody undergoing chemotherapy. And a reasonable jury could conclude, given the side effects of chemotherapy, that this was actually vomiting. Counsel, did Floyd meet with Mr. Craver often? Yes, Your Honor. And did Floyd also meet with the doctor that was in charge of Mr. Craver's health? Yes, Your Honor. And were there discussions between Floyd and the doctor regarding Mr. Craver's health? Yes, Your Honor. And were there discussions about his nutritional issues? Yes, Your Honor. But this court has held that the plaintiffs need not allege the complete deprivation of medical care in order to prevail in these types of claims. And in Snow v. McDaniel, getting to the deliberate indifference prong, this court held that evidence of an improper motive can constitute deliberate indifference. So despite the fact that Floyd did provide some follow-up here, we do concede that. We contend that this is still amounting to deliberate indifference for a few reasons here. First, because there is evidence of improper motive in the record, from which a reasonable jury could conclude that she was deliberately indifferent. So for the entire month of May, Floyd asserted that Craver's caloric requirements were from 2,700 to 3,100. Yet she was providing him with 2,400 at a maximum, because he could not stomach the boost due to his taste aversions, and she knew that the boost had been taken off of his prescription at that point. Still, he was losing weight during this time, during the month of May. Regardless of this fact, she slashed his calories by 500 the day after Craver conducted a grievance interview against her, specifically alleging that she was providing him with inadequate nutrition. Now, Floyd in her brief contends that this was because Craver's weight had stabilized, but the evidence in the record suggests that a jury could find the opposite. Two weeks prior to her making this slash, she indicated that Craver's weight had been trending downwards again. He was at an 8.8% body weight loss in the past six months, and that a goal of his was to, quote, prevent further weight loss. Was he, and maybe I misread this in the record, but didn't he have an overweight BMI this entire time? Yes, Your Honor. Craver's weight was in the overweight category. However, we contend that because he was still losing weight, presented the other evidence of these indirect symptoms, and presented direct evidence that Floyd knew his estimated nutritional needs were at a higher threshold than what she was providing him with, that that is still evidence of an inadequate nutrition. And did you see any muscle wasting? No, Your Honor, but according to MCSP policy itself, Craver was in the malnourished category. That's at 3 ER 365 and 364. MCSP policy does not only define malnutrition as dependent on an inmate's BMI. In fact, there's two possible categories of malnutrition. And the other category is a severe caloric or protein deficiency indicated by weight loss. And that is weight loss greater than 5% in the past six months. But didn't Dr. Snook agree with Floyd the entire time that the nutritional intake that he was being given was sufficient? And wouldn't that, wouldn't that be fatal to Craver's subjective prong? Respectfully, Your Honor, we do not believe that would be fatal. In Foster versus Reynolds, there was no medical indication whatsoever. But because the plaintiff presented evidence of dizziness, headaches, and hunger pains, this court reversed summary judgment, finding that a reasonable jury still could find deliberate indifference on the part of the defendant. And in Snow versus McDaniel, the case cited for improper motive just a few moments earlier, the court held that despite there being a difference in medical opinion between a group of physicians and another group of physicians as to what course of treatment was appropriate, that the lower court still improperly granted summary judgment because the one group of physicians did not recommend surgery. But isn't Foster distinguishable on the fact that the, I think that case was against a guard who deprived the inmate of food just to protect her own safety?  And the court in that case, Your Honor, reversed summary judgment as well, indicating that because the defendant, just because the defendant did not comply with certain provisions that the prison required them to, was not clear evidence that the defendant was not deliberately indifferent. And here as well, there was no indication that the inadequate nutrition was imposed as a kind of, for a kind of penological purpose. Rather, it was just deprivation in and of itself. And because of that, we contend, because of that and the improper motive evidence, I mean, given the fact that Floyd slashed his calories while his weight was trending downwards, there was no indication of the record contemporaneously as to why she made this decision. And because of the fact that Craver presented evidence that these inadequate, that these indirect symptoms, excuse me, were caused by the inadequate nutrition, we contend that this court should reverse and remand for further proceedings. So I still have a bit of a confusion here. Wasn't he undergoing chemotherapy at the time? Yes. Don't people sometimes who are undergoing chemotherapy lose weight? Yes. So we actually have evidence in the record here. Floyd is, of course, entitled to present that theory to a jury. We do not, we concede that. However, there is evidence in the record here that Craver presented causationally linking these indirect symptoms to the inadequate nutrition. That is specifically that during the month of August, he received outside care packages from his family. I see my time is up. May I continue? Yes. He received outside packages from his family. His weight went up and his other symptoms, headaches, fatigue, hunger pains, stopped. At this time, the supplemental excerpts of record at 0118 indicate that he was in chemotherapy at this point. So he's undergoing chemotherapy and these other symptoms abate. His weight goes up when he is provided with outside care packages. And I will give you some more time because I do want this question answered. What was in those care packages? I mean, is it chips, donuts, cookies? Yes. It's not healthy food, Your Honor, for sure. But that is just the provision of increased calories. And we contend that a reasonable jury could infer from this evidence coupled with the improper mode of evidence that both prongs were satisfied. Okay. Do either of my colleagues have any further questions? All right. Thank you. Thank you, Your Honor. We'll give you a full two minutes for rebuttal. Thank you. Good morning. Deputy Attorney General Oliver Wu on behalf of Defendant Floyd. Ms. Floyd was not deliberately indifferent. She provided appropriate dietary consultation for Mr. Craver and stabilized his weight after March 2020 when he was placed under her care. Ms. Floyd also took numerous steps to ensure... The weight went from 195 to 188. Is that stabilized? Yes, Your Honor. So most of Mr. Craver's weight loss occurred before March 2020 when he was placed under Ms. Floyd's care. And when he was placed under her care, he initially weighed about 199 pounds. Over the next couple of months, his weight stabilized around 195. And during periods following chemotherapy, his weight dropped because of the side effects of chemotherapy. So, for example, in June 2020, his weight dropped to around 188 pounds. And he regained that weight after he got off the chemotherapy and stabilized his weight then. Mr. Wu, I apologize for interrupting. Tell me the relationship between his weight starting to increase again and the care packages and the chemo. Was he still on chemo when he received those care packages and his weight increased? He was not on chemo during that time. But, Mr. Craver, they pointed out that his weight... that the care packages came in August 2020. But his weight actually peaked two months after in October at around 190 pounds when he was on chemo. After that chemotherapy session ended, his weight started dropping again as he lost water weight to a low of about 85 kilograms, so around 187 pounds. By mid-December, his weight started to increase again as he put more distance between him and the chemotherapy. So Mr. Craver's weight, while it were periods of fluctuation, they were generally correlated with his chemotherapy treatment. And more importantly, throughout this entire nine-month period, Ms. Floyd continued to assess Mr. Craver's weight and saw that he was not displaying any signs of malnutrition. There was no fat wasting or muscle wasting. He was exercising in his cell, and he was reported as consistently eating all of his meals. The overwhelming majority of his medical records show that he ate 90 to 100 percent of all of his meals. There were a few individual days where he ate less than that, about 70 to 75 percent. But those were four or five days, not a large amount of time. Ms. Craver also spoke with Dr. Snook on a regular basis to make sure that Mr. Craver was healthy and not showing signs of malnutrition. Ms. Floyd also spoke with the food administrator, her supervisor, to confirm that there were no food substitutions available and that she could not double Mr. Craver's portions as she asked and that the liquid nutritional supplements were the only option. Every time Mr. Craver complained to her about feeling hungry, she offered nutritional supplements and Mr. Craver refused them. She then offered him anti-nausea medications to help him tolerate the food and the supplements. Mr. Craver refused that as well. Mr. Craver also never complained of nausea to Dr. Snook, never asked for other types of anti-nausea medication. What do you say to Ms. Tillich's claim that Floyd deliberately reduced by 500 calories the intake when Craver made a complaint? So that occurred in the beginning of May. And it was actually Dr. Snook that cancelled the order of nutritional supplements, which was about 500 calories from his daily meals, because Mr. Craver told Dr. Snook that he didn't like the nutritional supplements and didn't want to take them. And by that time, end of April, beginning of May, Mr. Craver's weight had stabilized. He was, remember, he was originally placed under Ms. Floyd's care because his weight had dropped from over 210 pounds to just under 200. And so that rapid period of weight loss had already passed and Ms. Floyd had already begun to stabilize Mr. Craver's weight. It's also worth noting that the initial recommendation was for 2,700 to 3,100 calories, which is significantly above the regular calorie recommendation for a healthy adult. Even after the change, he was recommended 2,200 to 2,600 calories, which is, again, about slightly over the average recommended daily calorie consumption. Mr. Craver's meals also contained 2,400 calories on average. And so Mr. Craver had all of the calories presented to him that he would need to maintain his diet. Ms. Floyd actually spoke with kitchen staff to ascertain what was being provided on a daily basis in Mr. Craver's meals to determine how often the foods that Mr. Craver could not tolerate were being served to him. Ms. Talek notes that this circuit has held before that nutritional deprivation can rise to the level of deliberate indifference. How do you distinguish those cases? I believe Foster was one of them. Yes. So nutritional deprivation can certainly rise to the level of deliberate indifference. But in Foster, the inmate was actually being kept from getting all of his meals. The prison guard refused to provide the inmate all of the meals that was ordered for him. In this case, there's no dispute that Mr. Foster received everything that was ordered. He simply didn't like what he was given. Mr. Craver. But Mr. Craver, sorry. And so Mr. Craver simply didn't like what he was given. And the Eighth Amendment does not allow him to pick and choose what he wants to eat. And instead, Ms. Floyd took steps to help him tolerate and to make sure that he was getting all of the food Is there a conflict in the evidence about whether he refused because he didn't like it versus his claim that he couldn't tolerate it and vomited up the food? So I have two responses to that. First, with respect to the vomiting. Mr. Craver claimed to have vomited, but he never reported that to Dr. Schnook. And the kitchen, the nursing and custody staff could not confirm those reports of vomiting. So at this time, Mr. Craver was housed in the Correctional Treatment Center. The medical wing of the prison. And so nursing and custody staff would be monitoring him on a daily basis. And they never saw him vomiting. On top of that, they repeatedly asked Mr. Craver to undergo visual and GI assessments to confirm his vomiting. He refused every single one of these assessments. And so for Ms. Floyd's perspective, there was nothing to corroborate Mr. Craver's reports of vomiting. And this court in Mendiola Martinez has actually held that a prisoner's complaint of hunger by itself is not sufficient to show deliberate indifference. And that case is much more similar to the situation we have here, where the only evidence Mr. Craver presents of his hunger and nutritional deprivation is his own reports of hunger. There were no objective corroborations of those reports to Ms. Floyd. And at bottom, the deliberate indifference standard is a subjective one. It doesn't ask what Mr. Craver claims he experienced. Did you say deliberate indifference is a subjective standard? There is a subjective prong to the deliberate indifference standard. The standard asked whether Ms. Floyd recognized a serious risk to Mr. Craver's health and whether she disregarded that risk. But here, all of the evidence, all of the information presented to Ms. Floyd, the medical records, the consultations with Dr. Snook, her talks with the kitchen staff, her check-ins with custody and nursing staff, and as well as the various consultations she had with the food administrator, all showed that Mr. Craver was not at serious risk to his medical health and Ms. Floyd didn't disregard it. She took multiple steps, talking to all other staff, offering anti-nausea medications in order to stabilize Mr. Craver's weight and address whatever risk there could have been. And so in this case, Ms. Floyd was not deliberately indifferent and this court confirmed on that basis. Counsel, you've also asked this court to determine qualified immunity. Yes, Your Honor. That was not an issue dealt with in the district court. Why should we deal with it here instead of remanding it back? So the district court did not answer that question because it found on the merits for Ms. Floyd. So it decided that it was unnecessary to address that question. But this court can affirm on any basis supported by the record. And so if it wants, it can reach the qualified immunity question. And here, plaintiff has not offered any precedent clearly establishing a right to different foods because he didn't like it. In fact, all of the cases that plaintiff cites are distinguishable. I already talked about Foster and the same is true of Lolly, the other case that they cited in response to qualified immunity. Both of those cases dealt with situations where the prisoner was prohibited from getting food, where custody staff simply didn't want to give them food. But in this case, as I mentioned before, there's no dispute that Mr. Quiver got all of the food. And instead, Mendiola-Martinez is more on point where this court held that a prisoner's complaints of hunger by itself is not sufficient to establish deliberate indifference. I've got one more. The appellant leans heavily on the idea that Ms. Floyd had an improper motive in the way that she dealt out nutrition to Mr. Craig Craver. How do you respond to that argument? So the primary evidence plaintiff points to for improper motive is the reduction in calorie count. But the reduction in calorie count was because Mr. Craver's weight had stabilized and the reduction in calorie count was also to account for the cancellation of the liquid nutritional supplements, the 500 calories. And that was canceled by Dr. Snook, not by Ms. Floyd. Thank you, Your Honor. Thank you. Ms. Talbot, we put two minutes back. So firstly, all of defendant's points should be duly argued to a jury when that time comes. But given the affirmative evidence in the record here, both from Craver's verified complaint himself and from Floyd's notes herself, this case should go to a jury. I'd like to point out a few pieces of evidence in the record here that rebut the characterizations made by defendant. Is it your claim that a verified complaint is evidence in a motion of summary judgment? Your Honor, taking all facts viewed in the favor of the non-movement here, given that Craver could present this testimony to a jury, we believe the facts in his complaint should be considered here, especially given that the complaint was verified. And there is case law to this effect as well. That's Thomas versus Ponder. Well, his affidavit and his sworn factual statements are considered. Yes, Your Honor. And Thomas... Yes, if you want. Yes, and Thomas versus Ponder suggests that a prisoner's verified complaint can be treated as an affidavit in cases for summary judgment as well. Here, the complaint was verified. But turning to the points in the record that rebut a few of defendant's characterizations now. First, at record 3 ER 312, Craver, Floyd herself, excuse me, notes that Craver did report vomiting to his PCP. Second, Craver's weight was decreasing at the points the caloric slash was made. He dropped from 197 to 190 just prior to the caloric decrease. And that was at 3 ER 320 and 319. Third, Craver was in chemotherapy. Could you give me the citation as to the record report of vomiting? Yes, Craver reported the vomiting, or Floyd notes that Craver reported the vomiting to the PCP at 3 ER 312, Your Honor. Craver was also undergoing chemotherapy at the time he did receive the care packages from his family and at the time that his other symptoms stopped. And that finally is at SER 0118. But again, all of these points suggest that there are disputed issues of fact on both sides of the objective question and the subjective question. And for that reason, this court should reverse and remand. Thank you. Thank you. All right, thank you, counsel. This matter is now submitted.
judges: BEA, ALBA, Brown